**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 12 2013, 8:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KAREN M. HEARD**
Vanderburgh County Public
Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| CHRISTOPHER STARK, )<br>)<br>Appellant-Defendant, )<br>)<br>vs. )<br>)<br>STATE OF INDIANA, )<br>)<br>Appellee-Plaintiff. ) | No. 82A04-1207-CR-363 |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable R. Jeffrey Tornatta, Judge
Cause No. 82D02-1109-FD-1042

**February 12, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Christopher Stark was charged with five counts of Neglect of a Dependent,[1] a class D felony, when the police discovered his three children and his girlfriend's two children living in deplorable conditions in Stark's home. After a jury trial, Stark was found guilty of three counts of neglect of a dependent, and the trial court entered his convictions as class A misdemeanors.

Stark challenges the sufficiency of the evidence supporting his convictions. More particularly, he contends that the State failed to prove beyond a reasonable doubt that he placed his children in "actual and appreciable" danger or that his children were even exposed to the conditions of his home. Finding sufficient evidence, we affirm the judgment of the trial court.

FACTS

On August 17, 2011, Detective Todd Seibert of the Evansville Police Department (EPD) Juvenile Unit received a complaint that children in Stark's home were living in "absolutely filthy" conditions, and he and Detective Jeremy King went to Stark's residence to investigate the validity of the complaint. Tr. p. 7. As the officers approached Stark's home, they "could smell the odor coming from the house before [they] even got to the porch." Id. They also observed trash and clutter piled on the porch as well as "hundreds of flies." Id. at 8. The officers knocked on the door, and Valeri Harrelson, Stark's girlfriend, answered the door and allowed the officers to enter the

---

[1] Ind. Code § 35-46-1-4(a).

2

home.  Harrelson told the officers that she and two of her children had been "staying" at Stark's residence for "about a month."  Id. at 191.

When the officers entered the residence, they were "almost knocked down by the foul odor coming from the house."  Id. at 9.  They observed six dogs inside the home as well as a bird in a cage that looked as if it had not been cleaned in some time.  There was "clutter everywhere," and the carpeted floor was soiled with "dog feces that was scattered throughout the house."  Id. at 10.  Due to the amount of clutter, there were only "small, narrow passageways throughout the living room."  Id. at 9.  The officers also observed a large hole in the ceiling of the main living area "with drywall falling out of it."  Id. at 35.  A six-foot ladder was "standing open," and Detective King thought that this "would be a safety hazard with small children inside."  Id. at 24.

Moving throughout the house, the officers saw "a propane tank sitting [o]n the floor . . . in the walkway between the living room and the kitchen."  Tr. p. 22.  Dirty dishes were piled in the kitchen sink, and cockroaches were crawling around the sink and on the floor.  There was trash and "old food" strewn throughout the home on surfaces and on the floor.  Id. at 49.  And in one of the bedrooms on the main floor, there were open bottles of what appeared to be medicine lying on the dresser.

The wooden steps leading upstairs were covered in and "matted" with feces.  Id. at 66.  A large insect, possibly a cockroach, was also observed crawling on the stairs.  Lying on the floor at the top of the stairs was a towel that was completely soaked in what Detective Seibert believed was urine.

3

The upstairs bedrooms had children's bunk beds in them that looked unsafe and had no bed linens on them. In one of the rooms, another bed frame was perched unsteadily against one of the bunk beds. The bedroom floors were covered in dog feces. One of the rooms had a fish tank with two turtles inside it but that was partially covered by an article of clothing strewn over the tank. And in another bedroom, the floor was so covered with children's books, toys, and hangers intermingled with trash that the officers "could barely see the floor." Tr. p. 33.

The home had one bathroom, which reeked of the strong smell of ammonia and urine. Both the bathtub and the toilet had brown stains on them, and the bathroom floor was filthy and covered in a liquid that could have been urine.

Back downstairs, the steps leading to the back porch and basement were caked with mud and feces, and the landing was littered with trash and a large pile of dirty laundry. The basement had standing water in it but was also cluttered with electronics, bicycles, laundry baskets, dirty clothes, and blankets strewn across the basement floor. The officers were also alerted to the possibility that previously there may have been snakes roaming free in the home, possibly in the basement. However, no snakes were found.

On multiple occasions as they toured the house, Detective King and Detective Seibert "had to go outside and catch [their] breath a little bit because the smell, it was that bad." Tr. p. 12. To Detective Seibert, the ammonia smell was so strong he "could feel it kind of burning . . . in [his] throat area." Id. at 65.

4

As the officers toured the home, Harrelson's children came from the back of the house wearing no shoes despite the many piles of feces on the floor. One looked about two years old and the other about nine years old. The officers called the Department of Child Services (DCS) because "the whole place was unsanitary" and "not a place for children to be living inside." Id. at 11. The officers also called Animal Control regarding the conditions in which the animals were living. Finally, the officer requested that the EPD's Crime Scene Unit come to photograph the home. Detective Seibert also spoke to Stark on the telephone, and Stark was "extremely belligerent" and stated that "there was no reason for [the detectives] to be at his house." Id. at 64.

Animal Control Officer Kelly Yarde responded and took custody of Stark's six dogs and the cockatoo bird.[2] When asked about the snakes, Stark stated that he had recently given away two non-poisonous ball pythons to neighbors. Officer Yarde nevertheless conducted a search of the house for the snakes. She "didn't move everything in the house because it was just too much stuff in there, but a snake could have been hidden anywhere in that house." Tr. p. 46.

When Stark arrived home, he told Rebecca Anderson, the investigating DCS family case manager, that he had custody of his three children—seven-year-old K.S., eight-year-old C.S., and ten-year-old C.S.—and that "[h]e lived there with his three children and Valerie Harrelson and her two children." Id. at 49. Stark's children were not present during the investigation because he had dropped them off after school at his

[2] Officer Yarde turned one of Stark's dogs, a miniature pinscher, over to his mother because one of Stark's children was particularly attached to that dog.

mother's home a few blocks away. Anderson told Stark that his children could not return home while the house was in its current condition, and Stark made arrangements for his children to stay with his mother. He also gathered some of his children's belongings to take to his mother's home.

Stark "agreed that the house was not acceptable and that he would do his best to attempt to clean it up." Tr. p. 13-14. Stark claimed that "the kids and [Harrelson] did not properly take care of the house, and he couldn't keep the house clean because he was never there because he worked so much." Id. at 13. Stark did not take any responsibility for the condition of the animals or for the fact that their feces was throughout the home, instead stating that "the oldest boy was supposed to be responsible for them." Id. at 44.

After seventy-two hours, the DCS family case manager returned to find the house "dramatically improved," and Stark's children were permitted to return home. Id. at 52. Approximately a month later, Stark was charged with five counts of neglect of a dependent as a class D felony, one count for each of his own children and one for each of Harrelson's children who had been living in the home.

At the two-day jury trial that commenced on May 17, 2012, the State elicited testimony from the two EPD detectives, the animal control officer, the DCS family case manager, and the assistant principal of the school that Stark's children attend. The State also had admitted into evidence the photographs of the home and school records that indicated that Stark's children lived with him.

Stark testified that his children had not been living at his residence during the State's investigation. He admitted that the home was "not a healthy place for his children to be" and claimed that his children had been staying with his mother beginning in July. Tr. p. 169. However, Stark also testified that the home had been in that condition for three or four months.

Stark's mother also testified that Stark's children were staying at her house in August 2011 because Stark was working approximately between sixty and one hundred hours per week. Harrelson also testified that Stark's children were staying with their grandmother during the months leading up to the investigation in August 2011. Moreover, Harrelson testified that at the time of the incident, she and her two children were not living at Stark's home but had just stopped by to move a mattress and to clean up one of the upstairs bedrooms. Finally, three of Stark's neighbors testified that they "really didn't see [Stark's children] at the house" in August 2011. Id. at 88.

As a rebuttal witness to Father's claims that the children had not been living at his home, the State called Officer William Shirley of the EPD to testify that he had responded to a fight in Stark's neighborhood the week prior to the incident at issue and that Harrelson had been present at Stark's residence and that she had told him at that time that she was watching Stark's children, who were living there.

The jury found Stark guilty of the three counts of neglect of a dependent that related to his children but not guilty of the remaining two counts involving Harrelson's

7

children.  On June 13, 2012, the trial court entered Stark's convictions as class A misdemeanors[3].  Stark now appeals.

## DISCUSSION AND DECISION

As noted above, Stark contends that the State presented insufficient evidence to convict him of neglect of a dependent.  In pertinent part, the neglect of a dependent statute provides:

> A person having the care and custody of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly and intentionally:
>
> (1) places the dependent in a situation that endangers the dependent's life or health;
>
> . . .
>
> commits neglect of a dependent, a Class D felony.

Ind. Code § 35-46-1-4.  For someone to be convicted under this statute, the danger presented must be "actual and appreciable."  State v. Downey, 476 N.E.2d 121, 123 (Ind. 1985).  In addition, the State must show that the defendant "was subjectively aware of a high probability that he placed the dependent in a dangerous situation."  Dexter v. State, 945 N.E.2d 220, 224 (Ind. Ct. App. 2011).

Stark admits that he had custody of his children, but he asserts that the State failed to prove that the conditions of his home endangered his children's life or health because "[t]here was no testimony, expert or otherwise, as to what the health effects would be on

---

[3] See Ind. Code § 35-50-2-7(b) (granting a sentencing court the authority to enter a D felony conviction as a class A misdemeanor under certain circumstances).

8

the children." Appellant's Br. p. 9. Furthermore, Stark asserts that the State "failed to show that Mr. Stark's children had any significant exposure to the conditions in the home" such that their lives or health would be endangered. Id. at 11.

When reviewing a claim of insufficient evidence, we neither reweigh the evidence nor assess witness credibility. Roach v. State, 695 N.E.2d 934, 941 (Ind. 1998). Rather, we consider only the evidence and reasonable inferences supporting the judgment. Id. We will affirm if there is substantial evidence of probative value from which the trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

At the outset, we note that the facts of the instant case are strikingly similar to those presented by Germaine v. State, 718 N.E.2d 1125 (Ind. Ct. App. 1999). In Germaine, a mother was convicted of four counts of neglect of a dependent when her home was littered with heaps of garbage and decayed food, it was difficult to travel throughout the home because of all of the debris, and the home was infested with flies and hundreds of cockroaches. 718 N.E.2d at 1128-29. Like the instant case, the children were not present during the investigation. Id. at 1132. In affirming the mother's convictions, this Court noted that there was "sufficient evidence . . . from which the jury could reasonably infer that the children had been living there" and "that the house, which was filled with rotting garbage, flies, and cockroaches, exposed the children to the dangers posed by disease and fire." Id.

We similarly conclude here that the State presented sufficient evidence to support Stark's convictions. Even without expert testimony linking the conditions of Stark's

9

home with possible health problems, as the finder of fact the jury was free to determine whether the overwhelming amounts of dog feces and urine, garbage, and insect infestations, as well as multiple safety hazards such as the damaged ceiling, the propane tank in the middle of the living area, the open medication bottles and ladder, and the precarious bunk beds, presented an actual and appreciable risk of danger to Stark's children. Tr. p. 8-10, 22, 24-25, 31, 35, 65-66. Moreover, Stark agreed numerous times during the investigation and at trial that his home was unsanitary and a dangerous place for children. Id. at 13-14, 38, 67, 169, 179-80.

And although there was conflicting evidence presented about whether Stark's children were living at the home during August 2011, several of the State's witnesses testified that Stark told them on the day of the investigation that he and his children lived in the home. Tr. p. 44, 49, 67. Additionally, Stark admitted at trial that his home had been in the same state for approximately three or four months and that his children had only been staying with his mother for about a month. Id. at 169-70, 187. Given this testimony, the jury was free to disregard Stark's self-serving testimony and the testimony of his witnesses that suggested the children had not been living at the house while it was in its neglected condition. Accordingly, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

RILEY, J., and BARNES, J., concur.

10